# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CHERYL MATTHEWS,** ) | |
| ) | |
| ) | **Civil Action No.** |
| **Plaintiff,** ) | **19-11346-FDS** |
| ) | |
| **v.** ) | |
| ) | |
| **ANDREW SAUL, Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON CROSS MOTIONS
## REGARDING DECISION OF THE COMMISSIONER

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security

Administration ("SSA") denying an application for social security disability insurance ("SSDI")

benefits.

On November 30, 2017, the Court reversed and remanded the September 24, 2015

decision of an Administrative Law Judge ("ALJ") finding that plaintiff Cheryl Matthews is not

disabled. After a second hearing, the ALJ issued a new decision on January 3, 2019, again

denying her application for SSDI. On April 29, 2019, the SSA Appeals Council affirmed that

decision.

Plaintiff then filed this action asking the Court to reverse or remand the ALJ's second

decision. The Commissioner has cross-moved for affirmance. For the reasons stated below, the

decision will be affirmed.

I.      **Background**

The following is a summary of the relevant evidence in the administrative record.

("A.R.").

A.      **Factual Background**

1.      **Work History**

Cheryl Irene Matthews was born on October 24, 1952.  She has completed high school,

earned a certificate of completion in Business Management from Pine Manor College, and

completed entrepreneurial training through the Massachusetts unemployment agency.  (A.R.

(Dkt. No. 13) at 498–99).

From May 1975 until August 2003, Matthews worked as an accounts receivable

supervisor for the utility company NSTAR (previously Boston Edison Co.).  (*Id.* at 226).  For

several months in 2004, she worked for TREVIICOS, a construction company, reorganizing its

filing system.  (*Id.* at 161, 538).

From December 2004 through August 2005, she ran a kiosk business in Boston Logan

Airport selling Irish knit sweaters and sarongs.  (*Id.* at 161, 538, 499).

In November 2005, she began working as a sales associate for J.C. Penney.  (*Id.* at 226).

She held that position for two years at a store location in New Hampshire and five years at a

location in Florida.  (*Id.* at 226).  On July 28, 2012, she resigned from J.C. Penney because it

became difficult for her to stand and bend as much as the position required, the work was

stressful, and she was moving from Florida to Massachusetts.  (*Id.* at 171, 532–33).

On March 31, 2013, Matthews applied for SSDI benefits.  (*Id.* at 153–56).

2. **Medical History**

In 2006, Matthews was in an automobile accident in New Hampshire. (*Id.* at 190).[1]  She was hospitalized with whiplash, at which time the doctors discovered some problems with her gallbladder and liver enzymes.  (*Id.* at 55, 279).  After being released from the hospital, she received medical treatment from Dr. Brown, who did some bloodwork and sent her to a chiropractor.  (*Id.*).  She continued treatments with a chiropractor for a few years. (*Id.* at 190).

On February 11, 2008, Dr. Shams Tabrez evaluated Matthews in Florida for liver irregularities, rapid weight loss, and abdominal pain. (*Id.* at 174, 279).  Dr. Tabrez saw her again on February 19, 2008, and noted that blood test results showed elevated levels of liver enzymes and a CT scan of her abdomen showed dilation of the intrahepatic biliary tree.  (*Id.* at 272).  He ordered an MRI of her abdomen and a magnetic resonance cholangiopancreatography ("MRCP").  (*Id.*; *Id.* at 270).  On February 26, 2008, having reviewed the results of the MRCP, Dr. Tabrez referred Matthews to Dr. Nikolaos Pyrsopoulos for a liver biopsy.  (*Id.* 267–68).  The biopsy took place on July 15, 2008.  (*Id.* at 283).  Dr. Tabrez diagnosed primary biliary cirrhosis in July 2008.  (*Id.* at 283, 370).  At some point between February 11 and July 24, she started taking Urso Forte, generically known as ursodiol, which helps control the symptoms of primary biliary cirrhosis.  (*See id.* 279, 282–83, 241).

In September 2011, Dr. Tabrez noted that Matthews's liver function tests were "absolutely back to normal," and that the ursodiol medication was "controlling [her] symptoms." (*Id.* at 241).  At the same time, he also noted that she had a tiny stone or polyp in her gallbladder. (*Id.*).

---

[1] Matthews's medical history is largely repeated verbatim from this Court's earlier opinion.

Matthews began receiving primary care from Dr. Erin Murphy in Massachusetts in September 2012. (*Id.* at 332–33). On November 26, 2012, Dr. Murphy noted that Matthews was doing well and that her liver function tests "appear[ed] stable (alk[aline] phos[phatase] mildly elevated at 102)." (*Id.* at 323).

On November 19, 2012, Matthews sought treatment from a liver specialist, Dr. Karin Andersson. (*Id.* at 326). She was also examined by MGH fellow Dr. Jennifer Chen. (*Id.* at 331). The doctors noted that Matthews complained of fatigue and other problems, but that her liver appeared normal. (*Id.* at 326–27). The results of her stress test were also normal. (*Id.*). The doctors noted her self-reported diagnosis of primary biliary cirrhosis and that "she has several features that appear consistent with this, specifically fatigue, accompanied by an isolated alkaline phosphatase elevation, elevated HDL and LDL, and osteoporosis," but that her "pathology report [was] not typically of primary biliary cirrhosis." (*Id.* at 330). The doctors expressed interest in viewing the results of her original biopsy but determined that "it is highly likely that she has primary biliary cirrhosis." (*Id.*).

Matthews continued to see Dr. Murphy for routine assessments and Dr. Andersson for her liver condition. (*Id.* at 304–05, 311–13). In February 2013, Dr. Murphy noted that she was doing well, but was having some problems with her osteoporosis treatment. (*Id.* at 316). Dr. Murphy referred her to Dr. Frances Hayes for treatment of that condition. (*Id.* at 309–10, 318–21).

Matthews had another liver biopsy in March 2013, which reconfirmed a diagnosis of "[p]rimary biliary cirrhosis, stage 1." (*Id.* at 334). On March 25, Dr. Chen reviewed the biopsy results with Matthews and noted that she was "doing well on ursodiol" and "expresses difficulty with fatigue, which may be related to PBC, and unfortunately is not correlated with severity of

disease." (*Id.* at 313).  Dr. Chen also noted that she "was found to have osteoporosis" and that "although osteoporosis is associated with PBC, it is possible that this may not be related given bone disease typically correlates with severity of disease and her disease as above is mild." (*Id.*).

Matthews returned to Dr. Chen in June 2013, again complaining of fatigue and reporting that "she feels tired after doing routine chores (cleaning etc.)." (*Id.* at 306).  Dr. Chen noted again that Matthews "expresses difficulty with fatigue, which may be related to PBC, and unfortunately is not correlated with severity of disease." (*Id.* at 307).  Dr. Chen recommended that she take naps as needed and that she initiate an exercise program to improve her energy level, but indicated that "if her energy remains low despite these measures, we may consider the use of modanifil." (*Id.*).

In November 2013, Matthews saw Dr. Chen again, reporting that she had tried to exercise but was unable to do so. (*Id.* at 365).  Her liver tests remained normal. Dr. Chen recommended that they repeat the liver tests if Matthews decided to take certain supplements recommended by her son. (*Id.* at 366, 368).  She continued to complain of fatigue, and Dr. Chen noted "[w]e also discussed a potential trial of modafinil, but she does not endorse daytime somnolence." (*Id.* at 366).

In December 2013, Dr. Chen filled out a Massachusetts Disability Determination Services Form in connection with Matthews's claim for disability. (*Id.* at 370).  Dr. Chen reported that her disease was "stable, but the degree of fatigue is not associated with severity of liver disease." (*Id.*).  Dr. Chen described her "[m]ost recent clinical findings" as "severe fatigue, which is associated with this disease" and also stated that she strongly supported Matthews's claim for disability. (*Id.*).

Twice in January 2014, physical therapist Mary Bourgeois evaluated Matthews to assist her in implementing an exercise regime.  (*Id.* at 415, 417).  Bourgeois had her perform a light intensity walking program, during which she reported some shortness of breath.  (*Id.* at 416). Bourgeois encouraged her to continue with light exercise, as a way to rule out deconditioning as a cause of her fatigue.  (*Id.*).

In May 2014, Matthews saw Dr. Chen again.  (*Id.* at 402).  Dr. Chen noted that she was doing well on ursodiol and that her repeated liver tests were normal, but she complained that the fatigue was worsening.  (*Id.* at 402, 404).  They discussed other medications that could help with fatigue, although Dr. Chen did not prescribe any new medication.  (*Id.* at 404).

Matthews continued to see Dr. Hayes for osteoporosis in 2014 and 2015.  (*Id.* at 382).  In May 2015, Dr. Hayes noted that she was doing well on her medication and that her bone density had increased.  (*Id.* at 385).  Dr. Hayes also noted that her vitamin D levels were normal.  (*Id.*).

In May 2015, Dr. Chen filled out a Medical Source Statement of Ability to Do Work Related Activities for the SSA.  (*Id.* at 378–81).  In that report, Dr. Chen stated that "Ms. Matthews has primary biliary cirrhosis which is associated with fatigue" and "[h]er fatigue may limit her attention span and ability to concentrate throughout the day."  (*Id.* at 380).

In addition to her treating physicians, Matthews was evaluated by several state agency physicians.  In July 2013, state agency physician Dr. Jane McInerny determined that Matthews was limited in her ability to lift and carry objects, stand and walk for more than four hours, and sit for more than six hours in an eight-hour work day.  (*Id.* at 83).  Dr. McInerny noted that she has "isolated elevation of alkaline phosphatase" but "other laboratory data [was] within normal limits."  (*Id.*).  She also noted Matthews's "difficulty with fatigue[,] which is not necessarily correlated to severity of disease."  (*Id.*).

State agency psychologist Dr. Theodore Stronach evaluated Matthews in August 2013 and reported in September that her visual memory was much stronger than her verbal-auditory memory. (*Id.* at 350–52). He also determined that her global assessment of functioning score was 85, with no or minimal symptoms, but significant impairments from medical problems. (*Id.* at 353). Another state agency psychologist, Dr. Michael Maliszewski, identified her psychiatric impairments as non-severe in September 2013. (*Id.* at 82).

Dr. Yacov Kogan of the Massachusetts Rehabilitation Commission Disability Determination Services evaluated Matthews in April 2014. Dr. Kogan noted that she suffered from primary biliary cirrhosis; chronic symptoms of nocturia, daytime somnolence, and cognitive difficulties; and asthma. (*Id.* at 373). Dr. Kogan also determined that her cognitive functions were preserved and that work-related activities involving speaking, comprehending, remembering, and carrying out instructions were not limited, although exertional work-related activities were limited due to her asthma. (*Id.*).

In May 2014, Dr. Lawrence Fieman, a state agency psychologist, determined that Matthews's mental impairments were non-severe. (*Id.* at 95). Also in May 2014, Dr. Wayne Draper, another state agency physician, determined that she had exertional limitations concerning her ability to lift or carry, stand or walk, and sit over the course of a work day. (*Id.* at 96–97). Dr. Draper repeated the statement, which also appeared in Dr. Chen's and Dr. McInerny's notes, that Matthews's condition seemed stable on ursodiol and that "[s]he notes difficulty with fatigue which is not necessarily correlated to severity of disease." (*Id.* at 98).

On June 23, 2017, when her appeal of SSA's first denial of her disability claim was pending before the Court, Matthews experienced a terrible pain running from the base of her

skull into her neck, back, and right side while carrying a small watermelon at a grocery store. (*Id.* at 962).

On June 28, 2017, she reported to Dr. Marcia Zucker that her right arm and leg still felt weak and numb. (*Id.*). At this appointment, Matthews's right trapezius muscle was spasming, but she demonstrated an equal and strong hand grasp bilaterally and 5/5 strength in wrist and elbow flex and extension. (*Id.* at 963). Dr. Zucker recommended continued physical therapy. (*Id.* at 964).

On July 6, 2017, Matthews reported to physical therapist Trupti Rajendra Tanna that, earlier that week, she experienced pain in the middle of her back and neck immediately after mopping her kitchen. (*Id.* at 966). This pain was so severe that she felt she could not go up the stairs, but it subsided after six minutes. (*Id.*). On the same day, Matthews also reported this incident to Dr. Adaugo Amobi, and mentioned that she experienced a similar shooting pain from her neck to her finger once when she was 21 years old. (*Id.* at 969). Dr. Amobi suspected that Matthews may suffer from stenosis or disc disease, and ordered a cervical spine MRI. (*Id.* at 971).

On July 24, 2017, Dr. David Binder reviewed the cervical spine MRI and found "severe right neural foraminal narrowing" in both the C5-6 and C7-T1 discs, with "probable compression of the exiting right C6 nerve roots" and "possible compression of the exiting right C8 nerve roots." (*Id.* at 977). Dr. Binder gave her a prescription for a TENS (transcutaneous electrical nerve stimulation) unit; advised her to continue physical therapy; engage in "activity as tolerated"; and recommended that she engage in "preventive strategies, specifically avoidance of heavy lifting and the encouragement for [sic] daily stretching and strengthening program." (*Id.*).

During an April 18, 2018 appointment, Dr. Amobi wrote that despite "possible spinal pathology," Matthews "does not have consistent back pain," and recommended that she continue physical therapy and TENS treatment.  (*Id.* at 1007).  Dr. Zucker agreed with this assessment and plan.  (*Id.*).

On June 25, 2018, Dr. Emily Bethea completed a cirrhosis/liver disease assessment opining that Matthews's liver disease does not limit her ability to walk without rest or severe pain, rarely interferes with her ability to concentrate on work tasks, and does not cause the need to take unscheduled breaks.  (*Id.* at 749–50).

### B.       Hearing Testimony

On June 16, 2015, the SSA conducted its first hearing concerning Matthews's application for disability benefits.  (*Id.* at 35).

At that hearing, Matthews testified that she suffers from severe fatigue, chronic obstructive pulmonary disease ("COPD"), and memory problems.  (*Id.* at 54, 58, 69–70).  She testified that the fatigue stems from her liver disease, primary biliary cirrhosis.  (*Id.* at 54).  She further testified that she takes ursodiol to prevent her liver from attacking her body, and that the treatment has stabilized her liver but makes her need to use the restroom every twenty minutes.  (*Id.* at 57–58, 66).  She also uses an inhaler to treat her COPD, and stated that she can work at household tasks for about thirty minutes before needing a break.  (*Id.* at 58, 68–69).

As for her daily activities, Matthews testified that she drives only short distances.  (*Id.* at 61).  She can go grocery shopping, but can only carry one bag at a time.  (*Id.*).  She visits with friends, cooks, does her laundry, cleans her condominium, walks, watches TV, and flies to visit her daughter in Florida during the winter months.  (*Id.* at 61–62, 64).  She also takes care of her cat.  (*Id.* 183–84).

During that same hearing, a vocational expert ("VE") testified about Matthews's capacity for work under different scenarios. (*Id.* at 13, 71–76). The ALJ asked the VE to assume a person of Matthews's age, education, language skills, and work experience, with the following restrictions: lift and carry twenty pounds, only occasionally; sit for six hours in an eight-hour work day; occasionally climb stairs or ramps; never climb ropes, ladders, or scaffolds; occasionally balance, stoop, crouch, kneel, or crawl; avoid exposure to extreme heat or cool, as well as humidity, wetness, and pulmonary irritants; avoid concentrated exposure to heights and dangerous machinery; and easy access to a restroom. (*Id.* at 72–73). The VE testified that such an individual could perform Matthews's past work as a billing supervisor, but not her past work in retail sales. (*Id.*).

The ALJ next asked the VE to consider the job prospects of a person with the same features as above, with the following restrictions: occasional lifting and carrying twenty five pounds; frequent lifting and carrying ten pounds; the ability to sit for eight hours in an eight-hour work day; and the ability to stand or walk for an hour and a half in an eight-hour work day. (*Id.* at 74). The VE again testified that such a person could perform work as a billing supervisor, but not work in retail sales. (*Id.*). Matthews's attorney asked the VE to add the limitation of being off task fifteen to twenty percent of the time, due to fatigue. (*Id.* at 75). With that additional limitation, the VE determined that such a person could not work as a billing supervisor nor seek any competitive employment. (*Id.*). The VE also noted several transferrable skills from the billing supervisor position. (*Id.*). No other witness testified at the hearing.

On August 23, 2018, following this Court's remand, the SSA held a second hearing before the ALJ. (*Id.* at 494). On questioning from the ALJ, Matthews confirmed that she is not currently working and has not worked since the first hearing. (*Id.* at 499–500). She explained

that she had been living off of her Social Security income for two years, and an IRA prior to that. (*Id.* at 500).  She also affirmed that she still drives occasionally, flies to Florida to visit her daughter every three months, continues to care for her grandchildren during those visits, and goes grocery shopping once per week.  (*Id.* at 510–11).  She also continues to cook, clean her condominium, and do laundry. (*Id.* at 512).

At the second hearing, a different VE testified that Matthews's past work at J.C. Penney and TREVIICOS required light exertion; her kiosk work as-performed required medium exertion; and her work at NSTAR required sedentary exertion.  (*Id.* at 519).  The VE also testified that a person with Matthews's limitations as found by the ALJ could perform her past work at TREVIICOS and NSTAR.  (*Id.* at 520).  The ALJ credited that testimony as consistent with the Dictionary of Occupational Titles ("DOT"), and relied on it to find that Matthews was not disabled during the relevant period because she could perform past relevant work.  (*Id.* at 460).[2]

C.   **Procedural Background**

Plaintiff applied for SSDI benefits on March 31, 2013, asserting that she became disabled on July 28, 2012.  (*Id.* at 153–56, 78).  SSA initially denied her claim on September 5, 2013.  (*Id.* 78–86).  On June 16, 2015, she appeared and testified at a hearing before the ALJ.  On September 24, 2015, the ALJ ruled that plaintiff was not disabled within the meaning of sections 216(i) and 223(d) of the Social Security Act.  (*Id.* at 523–67, 584).

On September 6, 2016, the SSA Appeals Council denied review.  Plaintiff appealed to this Court on November 3, 2016.  (*Id.* at 1–6, 598).  On November 30, 2017, the Court reversed and remanded the ALJ's decision.  (*Id.* at 617–24).  The Court found that the ALJ had

---

[2] Matthews last met the insured status requirement for SSDI benefits on December 31, 2017, making the relevant disability period June 28, 2012, through December 31, 2017.  (A.R. at 444).

misinterpreted Dr. Chen's reports as being inconsistent with Matthews's claims of severe fatigue, and remanded for further review. (*Id.* at 621-22).

On August 23, 2018, the ALJ held a second hearing. (*Id.* at 494). On January 3, 2019, the ALJ issued his decision again denying the application. The Appeals Council affirmed that decision on April 29, 2019. (*Id.* at 492–522, 431–66).

 Plaintiff has again appealed to this Court. (Complaint (Dkt. No. 1) at 2). Plaintiff contends that the ALJ's January 2019 decision is not supported by substantial evidence, and seeks to reverse the decision or remand for a new hearing. (Pl.'s Mot. Rev. (Dkt. No. 15) at 1). The Commissioner has moved to affirm the ALJ's decision. (Def.'s Br. (Dkt. No. 17) at 20).

## II.   **Analysis**

### A.   **Standard of Review**

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *See Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts

based on the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

### B.   Standard for Entitlement to Disability Benefits

To qualify for Social Security Disability Income benefits, the applicant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe enough to prevent the applicant from performing not only his or her past work, but also any substantial gainful work existing in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed?  If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]'  If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations at 20 CFR. § 404.1520(a)(4)(iii)]?  If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . .  If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past?  If not, he is not disabled. If so, the agency asks the fifth question.

13

> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy?  If so, he is disabled; if not, he is not disabled.

*Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982).

The applicant bears the burden of proof for the first four inquiries.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").  If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's RFC in combination with vocational factors, including the applicant's age, education, and work experience.  20 C.F.R. § 404.1560(c).

C.    **The ALJ's Findings**

The ALJ followed that framework and concluded that plaintiff's claim failed at step four.

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity from her alleged onset date of July 28, 2012, through December 31, 2017, the date she last met the insured status requirements to receive SSDI benefits.  (A.R. at 444).  The ALJ determined that plaintiff last worked "as a general merchandise salesperson (DOT 279.357-054, SVP 3, light exertion)," at J.C. Penney.  (*Id.* at 161–62).  The ALJ further found that within the relevant 15-year period, plaintiff also worked as an "accounts receivable supervisor (DOT 214.137-028 [sic], SVP 8, sedentary exertion), and file clerk II (DOT 206.367-014, SVP 3, light exertion)." (*Id.* at 460).

At the second step, the ALJ found that plaintiff has two severe impairments:  chronic liver disease and asthma.  (*Id.* at 444).  The ALJ also considered seven other impairments

14

(gastroesophageal reflux disease, hypertension, osteoporosis, hyperparathyroidism, degenerative disc disease ("DDD"), cardiopulmonary disease, and COPD) and concluded that each was either non-severe or not medically determinable.  (*Id.* at 444–48).

At step three, the ALJ found that plaintiff does not have an impairment, or any combination of impairments, equivalent to any impairment listed in Appendix 1 of the Social Security regulations.  (*Id.* at 449).  In reaching that decision, the ALJ explicitly considered the Appendix 1 listing most analogous to each of plaintiff's severe impairments (Listing 5.05 for her chronic liver disease, and Listing 3.03B for her asthma), and explained why neither impairment meets or equals the respective listing.  (*Id.*).

At step four, the ALJ found that plaintiff's impairments leave her with the RFC to perform past relevant work as an accounts receivable clerk and file clerk II, both as actually performed by her and as generally performed in the national economy.  (*Id.* at 460).  To reach that conclusion, the ALJ followed the two-stage process in 20 C.F.R. § 404.1529 for evaluating symptoms.  First, he asked whether there "is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  (*Id.* at 450); *see also* 20 C.F.R. § 404.1529(a).  After reviewing plaintiff's testimony at both hearings, the ALJ found that her medically determinable impairments could produce her reported symptoms.

That finding required him next to "evaluate the intensity, persistence, and limiting effects" of plaintiff's symptoms "to determine the extent to which they limit [her] functional [capacity]."  (A.R. at 450); *see also* 20 C.F.R. § 404.1529 (c).  He found that her testimony about the limiting effects of her symptoms is "not entirely consistent with the medical evidence and

other evidence in the record." (A.R. at 451).  Indeed, he spent more than nine pages documenting discrepancies between plaintiff's hearing testimony and the medical records.  (*Id.* at 451–60).

Specifically, the ALJ found that the record shows that plaintiff's "chronic liver disease was stabilized even before the alleged onset date," and that she moved to Massachusetts from Florida after the alleged onset date, but thereafter "collected unemployment benefits for six months presenting herself as ready, willing, and able to work."  (*Id.* at 455).  Upon review of her liver disease treatment history, he concluded that the "evidence demonstrates benign diagnostic tests, laboratory findings and physical examinations, from the claimant's alleged onset date through her date last insured."  (*Id.* at 453).  He directly addressed Dr. Chen's reports, and corrected his initial interpretive error by reading the reports as consistent with plaintiff's allegations of severe fatigue.  (*Id.* at 458).  The ALJ explained that he assigned to each of those reports little or no weight because they are "generalized . . . conclusory and not specific."  (*Id.* at 458).  As to plaintiff's asthma, the ALJ discussed the results of her pulmonary function tests and found that this "evidence shows only mild pulmonary abnormalities" causing environmental work capacity limitations.  (*Id.* at 454–55).

The ALJ also discussed the evidence of plaintiff's DDD.  He discussed the results of a February 2017 MRI and physical examination by Dr. Binder, and observed that she "has treated this condition conservatively."  (*Id.* at 445).  The ALJ then concluded that "[w]hile the claimant reported on July 6, 2017 that the pain was of severe intensity and that she had twice experienced a pain shooting down to her hand, by April 18, 2018, Dr. Amobi noted that the back pain is not consistent."  (*Id.*).  Based on that review of the record, the ALJ concluded that plaintiff has the RFC to perform past relevant work.

Because the ALJ's step-four finding that plaintiff's RFC allows her to perform past relevant work means that she is not disabled, the ALJ did not reach the fifth step.  *See* 20 C.F.R. 404.1520(a)(4)(iv).

> **D.      Plaintiff's Objections**

>> **1.      Whether Substantial Evidence Supports the ALJ's Finding That Plaintiff's Cervical Degenerative Disc Disease Is Not a Severe Impairment**

Plaintiff contends that there is not substantial evidence supporting the ALJ's step-two finding that her "degenerative disc disease does not cause more than a minimal limitation in her ability to perform basic work activities and is therefore non-severe, due to the waxing and waning of the condition and because the claimant has not required more aggressive treatment." (A.R. at 446).  Specifically, she reads the ALJ's opinion as considering evidence related only to her lumbar spine while omitting discussion of her cervical spine condition.  (Pl.'s Mot. Rev. at 5).

It is true that the ALJ addressed plaintiff's DDD as a condition of the entire spine rather than separately analyzing each section of the spine.  Furthermore, as plaintiff points out, the ALJ did not expressly mention Dr. Binder's July 24, 2017 finding that an MRI of her spine revealed "[s]evere right C5-6 and right C7-T1 neural foraminal narrowing with probable compression of the right C6 nerve roots and possible compression of the right C8 nerve roots."  (A.R. at 977). But the ALJ nonetheless clearly considered the evidence of cervical, not just lumbar, DDD.

First, the opinion acknowledges that plaintiff "reported on July 6, 2017 that the [neck, shoulder, and back] pain was of severe intensity and that she had twice experienced a pain shooting down to her hand."  (*Id.* at 445).  That was the same reported pain that caused Dr. Amobi to order a cervical MRI.  (*See* Pl.'s Mot. Rev. at 5).

Next, the ALJ found that "by April 18, 2018, Dr. Adaugo Amobi noted that the back pain is not consistent." (A.R. at 445).  On that date, Dr. Amobi examined plaintiff and wrote that despite "[p]ossible spinal pathology," she "[did] not have consistent back pain." (*Id.* at 1007). That mention of "back pain" is a reference to the cervical DDD revealed by Dr. Binder's July 24, 2017 review of her cervical MRI.  Dr. Amobi's notes, under the heading "Back Pain/R Sided Upper and Lower Ext Sx," record that plaintiff "[w]as also seen by Binder in 7/2017 at that time recc PT, TENS unit." (*Id.* at 1004).  Thus the "back pain" that Dr. Amobi discussed in her April 18, 2018 report, and that the ALJ expressly considered, was the back pain caused by plaintiff's cervical DDD—not, as she alleges, only the pain caused by lumbar abnormalities.

In summary, the ALJ's opinion took into account the evidence of plaintiff's cervical DDD, and the step-two finding that her DDD is not severe is supported by substantial evidence.

### 2.      Whether the ALJ Relied on Medical Opinions That Were Based on a Substantially Incomplete Record

Next, plaintiff alleges that the ALJ erred in making his RFC determination by giving weight to medical opinions that either predate documentation of her cervical DDD or do not discuss that condition.  (Pl.'s Mot. Rev. at 6–7).  She contends that the ALJ's findings are not supported by substantial evidence because they rely in part on the opinions of Dr. McInerny and Dr. Draper, which predate her DDD diagnosis, and Dr. Bethea's June 25, 2018 opinion, which post-dates that diagnosis but addresses only her liver disease.  (*Id.*).  Although an ALJ may not give significant weight to a medical opinion "based on a significantly incomplete record," *Alcantara v. Astrue*, 257 Fed. Appx. 333, 334 (1st Cir. 2007), the opinions she challenges do not suffer from such a defect.

*Alcantara* involved a medical consultant's opinion that the plaintiff had no severe mental limitations.  *See* 257 Fed. Appx. at 334.  That opinion, the court explained, could not bear

significant weight because the record evidence of mental limitations underwent material changes

after it was offered.  *Id*.  Among other things, the plaintiff's father died after the opinion was

offered, and subsequent medical records showed that plaintiff's mental condition significantly

deteriorated as a result of that traumatic event.  *Id.*

Here, by contrast, each challenged medical opinion relied on a record that was

substantially complete as to the conditions it addressed.  Dr. McInerny's opinion addressed only

liver disease and possible mental disorders. (A.R. at 82).  Dr. Draper's opinion addressed only

liver disease and difficulty breathing.  (*Id.* at 96).  Moreover, the ALJ recognized that those

opinions were relevant only to the conditions they concerned.  (*See id.* at 459).  Plaintiff does not

contend that the record of her liver disease or chronic difficulty breathing has changed

significantly since 2013, when the first of these opinions was rendered, (*see* Pl.'s Mot. Rev. at 6–

7).  And nothing in *Alcantara* suggests that subsequent documentation of cervical DDD—an

unrelated ailment—renders the record of those separate medical conditions incomplete.  *See* 257

Fed. Appx. 333.  *Cf. King v. Comm'r of Social Security*, 2013 WL 1331209 at *7 (D. Mass. Mar.

28, 2013) (finding state agency physician's opinion that predated plaintiff's final visit with

treating physician was based on complete record under *Alcantara*).  Similarly, plaintiff identifies

no authority suggesting that Dr. Bethea's opinion concerning the limiting effects of her liver

disease was unreliable because Dr. Bethea did not also opine on her cervical DDD.  (Pl.'s Mot.

Rev. at 7).  As a result, she has failed to establish that the challenged medical opinions were

based on a significantly incomplete record.

Plaintiff further contends that even if those medical opinions are not incomplete, the ALJ

failed to address the cumulative effects of her cervical DDD in combination with the liver

disease and chronic difficulty breathing that those opinions address.  (Pl. Reply Br. (Dkt. No. 20)

at 3).  It is true that ALJs must consider the total limiting effects of all medically determinable impairments, including those that are not "severe."  20 C.F.R. § 404.1545(a)(3), (e).  But that is what the ALJ did here.  He explained that despite finding plaintiff's DDD non-severe, he nonetheless "considered this [non-severe impairment] along with the severe impairments in formulating the residual functional capacity, and has included exertional and postural limitations."  (A.R. at 446).  Because the ALJ did what plaintiff requests—and what regulations require—that is not a basis to reverse the decision.

### 3.   Whether the ALJ Fulfilled His Duty to Fully and Fairly Develop the Record

Plaintiff next alleges that the ALJ should have ordered another consultative examination or obtained a medical expert opinion to further substantiate her claims about the limiting effects of her cervical DDD.  (Pl.'s Mot. Rev. at 7).  The First Circuit has stated that

> under 42 U.S.C. § 405(g), a remand to the Secretary is appropriate where 'the court determines that further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing.'  There also must exist good cause for the failure to submit the new evidence to the ALJ.

*Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991) (quoting *Evangelista v. Sec'y of Health and Human Services,* 826 F.2d 136, 139 (1st Cir. 1987)).

Here, the evidence of plaintiff's cervical DDD-related limitations includes the following: (1) Dr. Marcia Zucker's June 28, 2017 examination-based impression that plaintiff may have degenerative joint disease in her cervical spine (A.R. at 964); (2) Dr. Binder's July 24, 2017 review of the MRI that documented her cervical spine abnormalities and his recommendation that she treat her condition with physical therapy, use of a TENS unit, and preventive strategies (*id.* at 974–78); and (3) Dr. Amobi's April 18, 2018 recommendation that she continue treating her cervical DDD according to Dr. Binder's instructions (*id.* at 1007).

The record appears to contain substantial evidence as to both plaintiff's cervical DDD-related limitations and the appropriate course of treatment, and there is no obvious reason to conclude that the record was not adequately developed.  Moreover, plaintiff has not shown good cause for her own failure to schedule another consultative examination or obtain a medical expert opinion on her own.  In *Heggarty*, the First Circuit found such good cause when the plaintiff was unrepresented and the burden of proof had shifted from the plaintiff to the government to prove at step five that jobs plaintiff could still perform existed in the national economy.  947 F.2d at 997–98.  Here, in contrast, plaintiff has been represented by counsel throughout the SSDI application process, and bears the burden of proof at step four, where the Commission found that her RFC allows her to perform past relevant work.  (A.R. at 523, 492, 460).  Because she has neither pointed to an evidentiary gap in the record nor shown good cause why she did not obtain the additional consultative examination or expert opinion she now requests, a remand will not be ordered on that basis.

### 4.     Whether the ALJ Made an Improper Lay Interpretation of Medical Data

Plaintiff next contends that the ALJ's finding that her cervical DDD is non-severe is based on an impermissible lay interpretation of medical evidence, and therefore constitutes reversible error.  (Pl.'s Mot. Rev. at 9).  In *Gordils v. Sec'y of Health and Human Services*, 921 F.3d 327, 329 (1st Cir. 1990), the First Circuit held that "the ALJ is not qualified to assess residual functional capacity based on a bare medical record."  Here, plaintiff asserts that it was impermissible for the ALJ "to opine that no limitations flow from severe neural foraminal narrowing with probable nerve root compression."  (Pl.'s Mot. Rev. at 9–10).

*Gordils* itself, however, provides a clarification that undermines plaintiff's argument. The court wrote:

if the only medical findings in the record suggested that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself.

*Gordils*, 921 F.2d at 329.

That hypothetical essentially describes the present case.  The medical evidence suggests that plaintiff exhibited little in the way of physical impairments attributable to cervical DDD, but does not discuss her limitations in functional terms.  Dr. Binder conducted a physical examination of plaintiff on July 24, 2017, the same day that he reviewed her cervical MRI, and found abnormalities causing probable nerve root compression.  (A.R. at 974, 977).  He noted that she "appears comfortable in no acute distress," walks with a normal gait, and exhibits "5/5 strength in the upper extremities." (*Id.* at 975).  Cervical extension, he found, "does produce some mild posterior neck pain." (*Id.*).  His recommended course of treatment involved use of TENS unit, physical therapy, and preventive strategies; he did not prescribe painkillers or recommend surgery.  It was reasonable under the circumstances for the ALJ to draw from that report the conclusion that plaintiff's DDD does not produce significant physical impairments, or at least impairments sufficient to effectively prevent sedentary work.  *Cf. Gordils*, 921 F.2d at 329 (upholding ALJ's "common-sense judgments about functional capacity" based on doctor's findings that the plaintiff had "no consistent neurological deficit, [and] [n]o clear, objective evidences, at present, to substantiate the diagnosis of an old protracted or new active lumbo-sacral Root Syndrome").

That conclusion is also supported by other record evidence.  Plaintiff's physical-therapy goals, for example, included the ability to reach overhead, carry a bag, drive with pain ranking less than 3 on a scale of 1 to 10, and to independently complete a home-exercise program.  (A.R. at 967).  That evidence, although not phrased in employment-functional terms, is also indicative

22

of a condition imposing no significant long-term physical impairments.  Accordingly, it was

permissible for the ALJ to infer, with the help of vocational expert testimony, that plaintiff had

the RFC to perform sedentary work.

### 5.       Whether the Vocational Expert's Testimony Supports the ALJ's Decision

Plaintiff alleges that the vocational expert testimony offered at plaintiff's two hearings

cannot support the ALJ's decision because it is based on a flawed RFC assessment.  (Pl.'s Mot.

Rev. at 10).  Because, as noted above, the ALJ's RFC determination is not erroneous, that

argument also fails.

### 6.       Whether the ALJ Relied on Proper Past Relevant Work Assessments at Step Four

Finally, plaintiff contends that the ALJ could not permissibly rely on the testimony of the

two vocational experts who assigned DOT titles to plaintiff's relevant past employment position

with NSTAR and opined that she retains the RFC to perform that type of work.  (Pl.'s Mot. Rev.

at 14).  Plaintiff argues that contrary to the opinions of both VEs, her position at NSTAR was not

"sedentary," but "light," and therefore precluded by her RFC limitations.  (*See Id.*).

Plaintiff alleges that the vocational expert who testified at the first hearing failed to

understand the nature of her position at NSTAR by assigning it the unspecific title of "collection

clerk."  (Pl.'s Mot. Rev. at 14).  In fact, the expert labelled plaintiff's position at NSTAR a

"utility billing supervisor," "DOT 241.357-010."  (A.R. at 562).  Although the generic title for

the position designated at DOT 241.357-010 is "Collection-Clerk," the listing includes multiple

alternate titles, including "Utility-Bill-Collection-Clerk."  (DOT 241.357-010).  The fact that the

expert identified plaintiff's past position, which she herself described as "supervisor of the

billing department," (A.R. at 503),  as "utility billing supervisor," and identified a DOT listing

that closely approximates this description, demonstrates that the expert understood the fundamental nature of her past work at NSTAR.

Plaintiff further alleges that a similarly insignificant issue discredits the testimony of the vocational expert testimony at the second hearing.  The expert at that hearing classified her NSTAR position as "Accounts Receivable Supervisor, DOT Code 214.137-028, SVP 8, sedentary exertion."  (*Id.* at 519).  The ALJ credited that testimony when concluding that plaintiff retains the RFC to perform her past relevant work.  (*Id.* at 460).  Plaintiff points out, however, that the expert made an error—there is no DOT Code 214.137-028.  (Pl.'s Mot. Rev. at 14).  But "Accounts Receivable Supervisor" is a position found at DOT code 214.137-022, SVP 8, sedentary exertion.  In other words, the expert appeared to have misspoken regarding the final digit in the DOT code.  Furthermore, the DOT description of that position closely matches plaintiff's hearing testimony concerning the nature of her position as a self-described "supervisor of the billing department" at NSTAR.  (*Compare id.* at 503–04, 535–36 *with* DOT code 214.137-022).

In short, plaintiff has not identified any inaccuracy in the VE's testimony except for the mistaken substitution of an "8" for a "2" in a 9-digit sequence.  Such a minor imperfection in an expert's testimony does not render the entire testimony unreliable, and certainly not as a matter of law.  Accordingly, there is no basis for the Court to disturb the ALJ's decision to credit the expert testimony that plaintiff's position at NSTAR required "sedentary" rather than "light" exertion.  *Cf. Edwards v. Sec'y of Health & Human Servs.*, 34 F.3d 1065, 1994 WL 481140, at *3-4 (1st Cir. 1994) (per curium) (no error when the expert neglected to cite any DOT codes).[3]

---

[3] Plaintiff also contends that she cannot perform the work she once performed for TREVIICOS.  (Pl.'s Mot. Rev. at 11–14).  However, because the Court affirms the ALJ's finding that she can perform her relevant past work at NSTAR, it is not necessary to reach the issue.

### III.   **Conclusion**

For the foregoing reasons, plaintiff's motion for an order reversing the final decision of

the Commissioner of the Social Security Administration is DENIED, and defendant's motion for

an order affirming the decision of the Commissioner is GRANTED.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 20, 2020                Chief Judge, United States District Court